F1N9MATH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        06 CR 150-07 (JSR)

5   MICHAEL MATERASSO,

6              Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        January 23, 2015
9                                       10:08 a.m.

10
    Before:
11
                       HON. JED S. RAKOFF,
12
                                        District Judge
13

14                       APPEARANCES

15
    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17  ANDREW BEATY
    DANIEL TEHRANI
18       Assistant United States Attorneys

19  SEWARD & KISSEL LLP
         Attorney for Defendant
20  RITA GLAVIN
    BRIAN P. MALONEY
21
    ALSO PRESENT:  CORINE VAN DRIMMELEN, Dutch Interpreter
22

23

24

25

F1N9MATH

1          (Case called)

2          (Hearing resumed)

3    NADIJA NEZIROVIC, resumed

4          THE COURT:  Please be seated.  Let me thank our

5    witness for being back here.

6          That's to be interpreted.

7          I said I want to thank our witness for being back

8    here.

9          THE WITNESS:  Okay.

10          THE COURT:  So, Ms. Glavin, you're first.

11   CROSS-EXAMINATION

12   BY MS. GLAVIN:

13   Q.  Ms. Nezirovic, you were visiting Irma and Michael in

14   October; is that correct?

15   A.  Yes.

16   Q.  And at some point during that visit Irma was very angry

17   with Michael; isn't that right?

18   A.  Yes.  She was angry with Michael.  Especially that one time

19   she was very angry.

20   Q.  She was angry with him because she thought he was cheating

21   on her, right?

22          MR. BEATY:  Objection, your Honor.  Hearsay.

23          THE COURT:  Well I think it's relevant background

24   to -- it's not being offered for its truth.  It's also, I

25   believe, undisputed, not that that would erase the hearsay

F1N9MATH                    Nezirovic - cross

1    objection.  But I don't see -- I think what you're inquiring

2    about is her understanding, the witness's understanding of why

3    Irma was mad at Michael, yes?

4            MS. GLAVIN:  I can rephrase it better, I suppose.

5            THE COURT:  All right.

6    BY MS. GLAVIN:

7    Q.  You understood that Irma was angry with Michael because

8    Michael was cheating on her, right?

9    A.  Irma was very angry with Michael.  Because she went to the

10   bank and found out where Michael had spent money.  And then she

11   went to the place where he had spent the money which was a spa

12   and found out he had been there with someone else.  And that's

13   why she was very angry with him at the time.

14   Q.  And she told you about this, correct?

15   A.  As soon as she came back from the bank and the spa, when

16   she came back she told me that he had spent a lot of money

17   there and that he was with someone there.

18   Q.  This was the day before you left for Holland; isn't that

19   right?

20   A.  No.

21   Q.  When was it?

22   A.  It was a few days before I left.

23   Q.  Did you know -- were you at the apartment when Irma

24   confronted Michael with those bank statements?

25   A.  I was home with the baby and she went to bring Gia to

1   school and then after that she came home from the bank.

2   Q.  That was not my question.  Please listen carefully to my

3   question.  Okay.

4   A.  Okay.

5   Q.  You were at the apartment when Irma confronted Michael

6   about the bank statements, correct?

7   A.  That's correct.

8   Q.  She was furious; is that right?

9   A.  I heard a fight going on in the bedroom when he came home

10  from work.

11  Q.  She was yelling at him; is that right?

12  A.  Yes.

13  Q.  He didn't hit her, did he?

14  A.  I did not see it.  I was in the living room.

15  Q.  Well she didn't tell you he hit her, did she?

16          MR. BEATY:  Objection, your Honor.

17          THE COURT:  Overruled.

18          THE WITNESS:  After the fight she went, took the

19  children to the playroom.

20          THE COURT:  No.  The question is did you see any

21  evidence or hear any evidence of physical fighting as opposed

22  to verbal fighting?

23          THE WITNESS:  No.  I did not see it.

24          I only heard them scream at each other in the bedroom.

25  Q.  You were angry with Michael because you believe he

1    mistreated your daughter; is that right?

2    A.  I was not angry with Michael and I'm still not angry with

3    Michael.  But I am worried about my daughter.  I see how she

4    lives and I heard about how things are going.  But now I

5    actually saw it, witnessed it firsthand.

6    Q.  When you say you heard about what was happening, you heard

7    about what was happening from your daughter; is that right?

8    A.  I heard them both screaming at each other.

9    Q.  Has your daughter told you about bad things Michael has

10   done to her?

11   A.  Not until later, until she went to the shelter.  I heard

12   many things about her life with him.

13   Q.  From her; is that right?

14   A.  From her.

15   Q.  And after Irma went to the shelter she was Skyping with you

16   and e-mailing with you; is that right?

17   A.  I did not see her via Skype but she did send some pictures

18   of the children.

19   Q.  So, from November 8 until now you have not Skyped with your

20   daughter?

21   A.  I Skyped with her when she was back in the apartment.

22   Q.  Would that be in December of 2014.  Last month?

23   A.  I think so.

24   Q.  And you understood from your daughter, Irma, that Irma was

25   not happy with Donna Materasso, didn't you?

A.  I want to ask for clarification about the question.  Was

she happy with Donna before she left to go to the shelter or

after?

Q.  I'm talking about in December of 2014, last month.

A.  Okay.

Q.  Do you understand?

A.  Yes.

Q.  Irma told you she was not happy with Donna; isn't that

right?

A.  I heard from her that she wasn't happy that Donna had given

some money but it wasn't the entire amount and the money came

from her job or from Michael and it wasn't the entire amount

for her and the children.

Q.  Irma helped you -- withdrawn.

        Last month Irma helped you write an e-mail to Donna;

isn't that right?

A.  No.  Never happened.

Q.  You sent an e-mail to Donna on December 17 of 2014; isn't

that right?

A.  I have sent her mail quite often.  I don't know which mail

you're referring to.

Q.  Did Irma help you write any of the e-mails you sent to

Donna?

        MR. BEATY:  Asked and answered, your Honor.

        THE WITNESS:  No.  No.

1              THE COURT:  Hold on.  Hold on.

2              What was the objection?

3              MR. BEATY:  Asked and answered.

4              THE COURT:  Overruled.

5              MS. GLAVIN:  Repeat the answer.

6              THE WITNESS:  No.

7   Q.  Showing you what is Defendant's Exhibit 44.  This is an

8   e-mail you sent for Donna and it's in English; is that right?

9   A.  Yes.

10             MS. GLAVIN:  With the assistance of the interpreter.

11             Didn't you tell Donna in this e-mail:  Do you even ask

12  yourself how she is making it by in the meantime financially?

13  She has sold everything she could.  Her TV, phones, and even

14  her clothes that were worth anything.

15             Didn't you say that to Donna in this e-mail?

16             MR. BEATY:  Objection as to relevance, your Honor.

17             THE WITNESS:  That she sold her clothes and.

18             THE COURT:  Overruled.

19             THE WITNESS:  Yeah.  Yes.

20             MS. GLAVIN:  Can we have Court Exhibit A, B, and C.

21  BY MS. GLAVIN:

22  Q.  Now, on Tuesday you remember testifying for the first time

23  in this courtroom, right -- no.  Was it Tuesday?

24             You've testified in this courtroom two previous days;

25  is that right?

F1N9MATH                    Nezirovic – cross

1   A.  Yes.

2   Q.  The first day that you testified you remember I was

3   questioning you and we had to stop for the day, right?

4           THE INTERPRETER:  Okay.  Let me rephrase.

5           THE WITNESS:  So what is the question?

6   Q.  Do you remember after the first --

7           THE COURT:  I think that was a good response because

8   it didn't sound like a question.  It sounded like a statement.

9   BY MS. GLAVIN:

10  Q.  You went home after the first day you testified; is that

11  right -- withdrawn.

12          You went to Irma's apartment after the first day you

13  testified; is that right?

14  A.  Yes.

15  Q.  And you went to Irma's apartment and you took pictures; is

16  that right?

17  A.  Yes.

18  Q.  And the pictures that you took that night you sent to the

19  Child Protection Services people, correct?

20          MR. BEATY:  Objection, your Honor.

21          THE COURT:  You can't do that.

22  BY MS. GLAVIN:

23  Q.  To Mr. Beaty; is that correct?

24  A.  Yes.  That is correct.

25  Q.  Looking at what is Court Exhibit B.  That's the photo you

 1    took, right?

 2              MR. BEATY:  Objection, your Honor, as beyond the scope

 3    of this examination.

 4              THE COURT:  I'm going to give some leeway here.

 5              THE WITNESS:  Yes.  The photo I took.

 6    Q.  You see a TV in the mirror; is that correct?

 7    A.  The television is next to the mirror.

 8    Q.  And Court Exhibit C, that's the photo you took and sent to

 9    Mr. Beaty; is that right?

10    A.  Yes.  Because I didn't understand -- I took the pictures

11    because the map of the apartment was not clear to me and to get

12    a better understanding I took the pictures so -- to show you

13    where I was and what I could see from where I was.

14    Q.  Let me ask the question again.  Court Exhibit No. C is a

15    picture you took and sent to Andrew Beaty, yes or no?

16    A.  I only know those two people and he was the one I sent it

17    to and he was the only one.

18    Q.  So you took the picture, Court Exhibit C, you took that

19    picture?  Yes?

20    A.  You don't have to scream at me.  There's so much going on

21    with my daughter, the children.  Please don't scream at me.

22              THE COURT:  Well I agree with that.  I think,

23    Ms. Glavin, you've got to lower the temperature a little.

24    However, the -- just so that I'm clear Ms. Nezirovic, did

25    you -- were you the one who took that picture, that photograph?

1              THE WITNESS:  Yes.

2              THE COURT:  Okay.

3    BY MS. GLAVIN:

4    Q.  And you took the photograph this week, right?

5    A.  Yes.  The evening after I was here.  When I saw the

6    apartment, the map and I don't know if it was the first or

7    second day.

8    Q.  Looking at Court Exhibit C, can you point out to us where

9    the TV is.  Point out where the TV is?

10   A.  You're screaming at me so I don't want to answer.  I'm here

11   to explain what I have seen and done and so you don't have to

12   scream at me.

13             THE COURT:  I have to agree with the witness,

14   Ms. Glavin, that you need to lower the temperature.

15   BY MS. GLAVIN:

16   Q.  Please point out --

17             THE COURT:  Excuse me now.  The question, however, is

18   would you point out where the TV is.

19             THE WITNESS:  The TV is here.

20             THE COURT:  Indicating towards the far left of the

21   photo beside the bookcase.

22             THE WITNESS:  The television is here.  Here is the

23   corner and here is the TV.

24   Q.  And you can see the reflection of the TV in the window; is

25   that right?

F1N9MATH                    Nezirovic - cross

1    A.  Yes.

2              MS. GLAVIN:  I have no further questions, your Honor.

3              THE COURT:  All right.

4              MR. BEATY:  Brief redirect, your Honor.

5    REDIRECT EXAMINATION

6    BY MR. BEATY:

7    Q.  Ms. Nezirovic do you see Defendant's Exhibit 44 in front of

8    you?  Do you still have that in front of you?

9              Is it your understanding that that e-mail was written

10   by your son, Damir?

11             MS. GLAVIN:  Objection.

12             THE COURT:  Ground.

13             MS. GLAVIN:  I'm still thinking of that.

14             THE COURT:  Pardon.

15             MS. GLAVIN:  I'm still thinking.  Foundation.

16             THE COURT:  That won't do it.  Leading would do it.

17             MS. GLAVIN:  Leading.

18             THE COURT:  Sustained.

19   BY MR. BEATY:

20   Q.  Ms. Nezirovic do you remember testifying on direct

21   examination that you wrote that e-mail with the help of your

22   son, Damir?

23             MS. GLAVIN:  Same objection.

24             THE WITNESS:  Yes.

25             THE COURT:  No.  I'll allow that as foundational to

1    the question you're hopefully about to put.

2    Q.  Did Irma help you write that e-mail?

3    A.  She never helped me to compose any e-mails.  I am not

4    crazy.  I'm not -- I can read and write.  And she never helped

5    me.  And I know exactly all -- the content of the e-mails that

6    I sent to Donna.

7              THE COURT:  I have a few questions.  Forgive me,

8    counsel.

9              So my recollection, correct me if I have this wrong,

10   is you prepared this e-mail but your English wasn't good enough

11   and so you asked your son to translate it and put it into

12   better English.  Do I have that right?

13             THE WITNESS:  Yes.

14             THE COURT:  And do you know whether your son was in

15   communication with Irma during that process.

16             THE WITNESS:  Can I explain how we have -- how we have

17   composed this e-mail?

18             THE COURT:  Of course.

19             THE WITNESS:  My son called me very early in the

20   morning or in the middle of the night.  It was about 3:30 a.m.

21   or 4 o'clock.  I was still in bed.  And he told me that Irma

22   had called him to ask to speak to Ms. Donna to talk about her

23   situation.  I told him that he could not bother Donna, that it

24   is not your business.  I told him I will send -- try to make an

25   e-mail and -- or send a message was the literal words -- send a

1    message to Donna because I knew what Irma needed to speak to --

2    my son told me what Irma needed to speak to Donna about.

3            I told him can you make a message and I did not go

4    downstairs yet.  It was cold and I had a headache.  And on my

5    telephone -- through my telephone I told him what the content

6    of the message should be.  And he wrote everything down.

7            I went downstairs later and I got on the computer and

8    there I saw there was a message from Irma and I was surprised

9    that I wanted to -- that I received a message from Irma.

10           And then I checked through Google Translate what the

11   message said.  Everything was correct that I told my son he

12   should write a message to Donna.  So I did make a copy of the

13   text and I sent it to Donna.

14           THE COURT:  So I'm a little unclear about one thing.

15   The message you got from Irma was about -- was her telling you

16   her ideas for the message you should send to Donna?

17           THE WITNESS:  I told my son that he should make a

18   message for Donna.  And the message should be sent from me.  On

19   behalf of me.

20           THE COURT:  I thought -- I'm sorry.  Go ahead.  I

21   thought you just said -- maybe I misunderstood -- that before

22   that was finished you received a message, was it from Irma?

23           THE WITNESS:  I just received a message from Irma with

24   the content, without text from her.

25           THE COURT:  I don't understand that.  Explain it

1     again.

2              THE WITNESS:  When I was at the computer I saw the

3     message from Irma.

4              THE COURT:  What was the message from Irma?

5              THE WITNESS:  That this was the message.

6              THE COURT:  Wait a minute.  You're looking at Exhibit

7     44, right?

8              THE WITNESS:  Yes.

9              THE COURT:  And that's a message from you to Donna, is

10    it not?

11             THE WITNESS:  Yes.  Later I heard from my son and I

12    asked him why did you send it to Irma?  I wanted to send it to

13    Donna.

14             THE COURT:  So your son sent it to Irma?

15             THE WITNESS:  Yes.  He sent it to Irma because to keep

16    her quiet.  She was starting to panic because the electricity

17    was going to cut off and she couldn't live in a dark apartment.

18             THE COURT:  So then what did she send to you?  What

19    did Irma send to you?

20             THE WITNESS:  Just the message she received from my

21    son.

22             THE COURT:  Why would she send that to you?

23             THE WITNESS:  The contents of the message was for me

24    not for her.

25             All the messages I sent to Donna I also sent to Irma

F1N9MATH                    Nezirovic - redirect

1   because I wanted to keep her from panicking, to keep her quiet,

2   and because she had been in a fight with Donna.

3           THE COURT:  Did Irma have access to using your e-mail?

4           THE WITNESS:  No.

5           THE COURT:  So, you have just the one e-mail address,

6   one e-mail that you use which is N dot Nadija at Gmail dot com?

7           THE WITNESS:  Yes.

8           THE COURT:  Let me show you page two of Exhibit 45 and

9   look at the -- the interpreter, if necessary, can help you with

10  the translation.  But I'm really only interested in the first

11  few lines of that page.

12          THE INTERPRETER:  I did the first five, six lines.

13          THE COURT:  My question first is so this is an e-mail

14  you also sent to Donna on December 17, 2014, yes?

15          THE WITNESS:  If that's what it says then, yes that's

16  correct.

17          THE COURT:  You're familiar with the fact that when

18  you send or receive an e-mail the time is stamped, yes?

19          THE WITNESS:  Yes.

20          THE COURT:  So -- are you familiar on your own Gmail

21  as to the -- how the time appears, what the format is?

22          THE WITNESS:  Yes.

23          THE COURT:  So if you look at the top here it says

24  2014-12-17.  That means December 17, 2014, yes?

25          THE WITNESS:  Yes.

1           THE COURT:  Correct?

2           THE WITNESS:  Yes.

3           THE COURT:  Then it says 9:34 GMT plus 01:00.  That

4    means that it's 9:34 Holland time because Holland time is one

5    hour different from English time?

6           THE WITNESS:  At night, one?

7           THE COURT:  So GMT -- do you know whether GMT stands

8    for Greenwich Mean Time which is the time in Greenwich,

9    England?

10          THE WITNESS:  It's 1 o'clock in the morning?

11          THE INTERPRETER:  Am I allowed to explain?

12          THE COURT:  Let me try.  You see the 9:34?

13          THE WITNESS:  Yes.

14          THE COURT:  So that's the time in the Netherlands when

15   you sent the e-mail according to this.

16          Do you understand?

17          THE WITNESS:  Yes.  If that's what it says that's

18   correct.

19          THE COURT:  But are you familiar that on your own

20   e-mail that there's this notation?  Have you seen this kind of

21   notation on your own e-mails?

22          THE WITNESS:  Yes.

23          THE COURT:  Are you familiar with the fact that when

24   it is 9 o'clock in the Netherlands it's 8o'clock in England?

25          THE WITNESS:  The time goes back?  Or forward?

1              THE COURT:  I'm sorry.

2              THE WITNESS:  The time goes back an hour?  Or it goes

3      forward?

4              THE COURT:  Because the time is, in the Netherlands,

5      is one hour earlier than the time in England.  If you know.

6      I'm just asking if you're familiar with that.

7              THE WITNESS:  No.

8              THE COURT:  Okay.  Do you remember sending this

9      e-mail, the one on page two of Exhibit 45?

10             THE WITNESS:  Yes.  Very well.

11             THE COURT:  And turn to first page of the exhibit.

12     There's an e-mail also sent on December 17, also sent from you

13     to Donna, yes?

14             THE WITNESS:  Yes.

15             THE COURT:  And do you recollect that's another e-mail

16     you sent?

17             THE WITNESS:  Yes.  Irma had told me that Michael will

18     get out of jail with some bail money.

19             THE COURT:  Now these e-mails, the two that we were

20     just looking at, you wrote but used Google Translate to turn

21     them into English; is that right?

22             THE WITNESS:  Yes.

23             THE COURT:  All of these e-mails were because you did

24     not want Michael to get out of jail, yes?

25             THE WITNESS:  Irma was afraid of him and so when he

1    gets out of jail again she was again afraid.  And I also was

2    worried because I am afraid he can be dangerous.

3              THE COURT:  So throughout the morning and into later

4    in the day on December 17 you were receiving constant updates

5    from Irma as to what was going on; is that fair?

6              THE WITNESS:  I -- we called each other a lot.  We

7    constantly were on the phone, during the day, in the middle of

8    the night.  She was very emotional and upset.  And I just

9    wanted to speak to her.

10             THE COURT:  Then let me ask you one last time, because

11   we've sort of been over this but I just want to be absolutely

12   clear.  With respect to Exhibit 65.

13             THE INTERPRETER:  45, your Honor.

14             MR. BEATY:  Your Honor, I don't believe that exhibit

15   has been shown to the witness.

16             THE COURT:  What is the one down there?

17             THE INTERPRETER:  44.

18             THE COURT:  Well let me show you 65.

19             So that's the e-mail from Irma to you with the very

20   same language of your e-mail in Exhibit 44 to Donna.

21             THE WITNESS:  Yes.

22             THE COURT:  And every indication is that that was sent

23   to you, and I think you also testified, sent to you by Irma

24   before you sent the very same e-mail to Donna, true?

25             THE WITNESS:  No.  But when Irma sent this to me I

1    checked it through Google Translate.  And once I checked it,

2    I -- my son had written it, and then I sent it to Donna.

3            THE COURT:  Right.  So do you have any understanding

4    why your daughter Irma was sending you the text of the e-mail

5    you were going to shortly thereafter send to Donna?

6            THE WITNESS:  I did not understand why my son sent the

7    e-mail to Irma instead of Donna and the e-mail should have gone

8    to Donna directly, not to Irma.  Later when I spoke to my son

9    he told me why he had sent the e-mail to Irma, because he

10   wanted her to quiet down and not be so panicked at the time.

11           THE COURT:  Right.  But why is she sending it back to

12   you?

13           THE WITNESS:  Because it wasn't for her.  The mail was

14   not meant for her.  The mail was meant for Donna and she sent

15   it back to me.  She wanted me to know.

16           THE COURT:  To know what?

17           THE WITNESS:  We always sent -- I always sent the

18   mails also to Irma so she knew that I was in contact with

19   Donna.

20           THE COURT:  Were you talking with her on the phone at

21   the same time this was going on involving these various

22   exchanges of e-mails that we've been looking at?

23           THE WITNESS:   Irma and I talked a lot over the phone.

24   And we talked about the fact that she had trouble paying for

25   school for Gia, and for her electricity, and for television and

1    that's why -- television I think meaning cable -- and that's

2    why we spoke a lot.  And we did not speak about -- always speak

3    about my contact with Donna and what I said to her in the

4    mails.  That's why I asked Donna to get some financial support

5    from them because I cannot pay for everything for Irma.

6              THE COURT:  This e-mail exchange that you had with

7    Donna and that your son drafted, this was very early in the

8    morning I think you said.

9              THE WITNESS:  Yes.  I slept very poorly the entire

10   time, the entire two months.  And my mobile telephone is always

11   next to my bed.

12             THE COURT:  So when Donna -- excuse me.  When Irma

13   sent you the e-mail back to you that she had received from your

14   son -- let me rephrase this question.

15             When Irma sent you the e-mail with the very same text

16   that you were then going to send to Donna, wasn't it your

17   understanding that she was saying that she approved the sending

18   of that e-mail?

19             THE WITNESS:  I think that Irma sent me the message

20   because she understood that the mail was supposed to be sent to

21   Donna and not to her.  So she always got e-mails from me but

22   never from my son.

23             THE COURT:  Are you saying she sent it to you to show

24   you what she had received from her son?

25             THE WITNESS:  I just made a copy and sent it to

1    Ms. Donna and I don't recall.

2           All the mails that I have sent to Donna I also sent to

3    Irma because I wanted Irma to know that Donna was not angry

4    with her and I wanted them to have a good relationship and not

5    fight over anything, so --

6           THE COURT:  That's not really what I was asking about.

7    But all right.  Counsel, go ahead.

8           MR. BEATY:  One moment, please, your Honor.

9           (Pause)

10          No further questions, your Honor.

11          THE COURT:  All right.  Anything else?

12          MS. GLAVIN:  No, your Honor.

13          THE COURT:  Thank you so much.  You may step down.

14          (Witness excused)

15          THE COURT:  My understanding is that counsel decided

16   late yesterday that they would prefer to give oral summations

17   today rather than written summations; is that correct?

18          MR. BEATY:  That's correct, your Honor.

19          THE COURT:  All right.

20          MS. GLAVIN:  That's correct, your Honor.

21          THE COURT:  So, is the government ready to go or shall

22   we -- do you want a short break since there was a little extra

23   testimony?

24          MR. BEATY:  Short break would be appreciated.

25          THE COURT:  So we'll take a ten-minute break.

1          How long roughly are you going to be on your

2    summation?

3          MR. BEATY:  No more than 20 minutes.

4          THE COURT:  Okay.

5          (Recess)

6          MR. BEATY:  May it please the Court, the government

7    has demonstrated by a preponderance of the evidence that

8    Michael Materasso unlawfully restrained his wife in violation

9    of New York law.

10         This case is ultimately about whether you believe

11   Nadija Nezirovic or Michael Materasso.  This case is not about

12   Irma.  It's not about ACS.  It's not about a wide-ranging

13   conspiracy.  It's about whether you believe the testimony of

14   Ms. Nezirovic, a 61-year-old former social worker, about what

15   she observed on November 5.

16         Now the specification at issue charges the defendant

17   with unlawful imprisonment.  To prove a violation of that under

18   New York Penal Law Section 135.05 the government must establish

19   simply that the defendant restrained another person.  The

20   statute defines restrain to mean to restrict a person's

21   movement intentionally and unlawfully in such a manner as to

22   interfere substantially with his liberty by confining him

23   without consent and with knowledge that the restriction is

24   unlawful.  A person is so confined without consent when it's

25   accomplished by physical force, intimidation or deception.

1              The evidence in the record demonstrates that the

2     defendant did so by tying up Irma Materasso nearly naked to a

3     chair.  Ms. Nezirovic testified that she was woken up on the

4     morning of November 5 by the sounds of the defendant's voice in

5     the living room.  She admits that she didn't understand what he

6     was saying.  But he was talking loudly.  It was early in the

7     morning before the sun came up.  She left her bedroom and in

8     the living room she saw her daughter topless, seated on her

9     chair, with her arms behind her back.  The defendant was

10    standing next to the chair fully clothed.  After Ms. Nezirovic

11    asked what was going on, Mr. Materasso looked at her very

12    angrily and then leaned down to untie a rope.  And it was at

13    that moment when Ms. Nezirovic realized that her daughter's

14    hands were, in fact, tied behind her back.  Then the defendant

15    got his coat from the closet and left the apartment.

16             You could tell by Ms. Nezirovic's demeanor that she

17    was telling the truth.  It was clearly painful for her to talk

18    about.  When your Honor was asking her detailed questions about

19    the event that morning she got a little emotional.

20             You can tell she was telling the truth by the details

21    she remembered as well as the things that she frankly admitted

22    she didn't know or can't remember.  She remembers what Irma was

23    wearing and what she wasn't wearing.  She remembers what she

24    and Irma did next.  But she candidly admitted that she doesn't

25    know certain details like what kind of rope Irma's hands were

F1N9MATH                       Summation - Mr. Beaty

1    tied with.

2              And her testimony is corroborated in small ways that

3    she couldn't have known would come into evidence.  She

4    testified that Irma and Michael had argued about bank

5    statements about a spa.  She said that argument took place in

6    the bedroom.  The defendant said the same thing on the stand.

7              Ms. Nezirovic testified that the defendant came home

8    late one night and tried to get in but that Irma wouldn't let

9    him in.  Instead, Irma blockaded the door with chairs and with

10   the children's stroller.  The defendant testified that he came

11   home late that night after being out with friends and he got

12   locked out.

13             As Ms. Nezirovic testified the next day the defendant

14   didn't go to work.  Instead, she says he spent the next several

15   days sleeping late at the apartment.  She didn't say she knew

16   why the defendant was sleeping.  The government's theory about

17   why he was sleeping is he was crashing after going on a meth

18   binge.  But the testimony that he was home and not working

19   those days is corroborated by Probation Officer Olivares who

20   testified about the absence of paystubs.  And it's corroborated

21   by the defendant himself who told you that he didn't go to work

22   those days.

23             Ms. Nezirovic's testimony is corroborated about the

24   February 2013 incident.  She told the Court that she went back

25   to Irma and Michael's house after walking the dog.  And she saw

1    a scene of Michael standing over Irma while Irma cried on the

2    couch.  The window was completely broken and there was glass

3    all over the couch and the floor.  She didn't know that Donna

4    Materasso was going to corroborate that.  She didn't know that

5    Michael Materasso was going to admit it.  And, in fact, she

6    didn't even tell you that she saw the defendant do anything.

7    She just told you what she observed when she got back from

8    walking the dog.

9         But then Donna Materasso did get on the stand and

10   corroborate that that incident happened.  And the defendant did

11   admit that he kicked a plastic chair through the window.  And

12   importantly her testimony is corroborated by the fact that Irma

13   took her daughters and left the apartment that day to go to a

14   domestic violence shelter.

15        If Irma simply wanted to get away from Michael she

16   could have gone to stay with Michael's parents, stay with a

17   friend, or even in a hotel.  She didn't.  Instead, she packed

18   up all their things and went to stay in a shelter for six days.

19        Think about all of the things that Ms. Nezirovic could

20   have embellished to make her testimony more dramatic.  But she

21   didn't.  For one, why would this be the story she chose to make

22   up?  Why not make it more compelling?  More abusive?  More

23   violent?  She just told you what she saw.

24        And even with this incident she didn't tell you that

25   as soon as Michael left she spent hours consoling Irma and then

F1N9MATH                      Summation - Mr. Beaty

immediately took her to a shelter.  She told you what happened.

That Irma was distraught and Irma went back to her bedroom to

see Gia.  Irma stayed there a while.  Ms. Nezirovic had a cup

of coffee.  The two of them later took Jack the Pit Bull to a

groomer.  This is not an embellished story, your Honor.

There was a lot of testimony about Ms. Nezirovic's

understanding of floor plans and placement of hutches.  This is

a nonissue.  It's not in dispute that Ms. Nezirovic knows the

layout of the apartment or that she was actually staying there

that night.  In fact she's staying at that apartment right now.

The question is not whether she had a good view of

what happened the morning of November 5 or whether she could

see it from the right angle.  The question is whether you

believe it happened at all.

The only evidence in the record that this didn't

happen is Michael Materasso's testimony.  This is a man who has

violated the Court's orders on four different occasions.  He's

admitted to lying to his probation officer on numerous

occasions, essentially lying to the Court.  And, in fact, he

did lie to the Court.  He got on the stand and he lied.

He was asked specific questions about doing drugs, the

timeframe, where it might have happened, the type of drug.  I

submit you don't simply forget using cocaine at a specific

event, at a friend's wedding, just over a week after getting

out of prison.  And he only admitted that he lied to the Court

F1N9MATH                    Summation - Mr. Beaty

after he was confronted with the evidence.

This is what the defendant does.  He denies what he cannot admit and admits what he cannot deny.  He claims that he didn't do drugs at any other time during his supervised release other than the two times he initially admitted and then the third time he was forced to admit.  But I submit you can't credit that testimony either.

In addition to the admitted drug use, the defendant's drug testing record, Government Exhibit 5, is perfectly consistent with someone who is using drugs and trying to skip out on drug tests when he knows that he'll test positive.  He failed to show up for a random drug test on October 2.  He claims now on the stand that Mr. Olivares told him there was no drug testing that day.  But Olivares didn't testify to that.  And the drug test history indicates a missed test.  And he didn't have a make-up test until five days later.  That test was negative.  The defendant rescheduled a test on October 27.  And then when he was tested three days later the sample was diluted.  Mr. Olivares testified that people dilute their urine in order to test negative.

The defendant has previously relied on a defense before your Honor that his threatening behavior was a product of his drug use.  Given his admitted drug use and the strong implication that he was using throughout this term of supervised release, I submit that the drug use helps explain

1   the many arguments that Ms. Nezirovic says she observed and it

2   helps explain Irma's fear of him which her mother observed when

3   she saw Irma blockading the door to their apartment.  It helps

4   explain the days the defendant spends sleeping in after not

5   having come home for a few days.

6          The defense's theory is that the defendant is the

7   victim of an international conspiracy to kidnap children,

8   obstruct justice, and commit perjury.  The defense is arguing

9   that Ms. Nezirovic is lying on behalf of her daughter, but

10  there is no evidence to back that up.  She has no motive to

11  lie, to travel from the Netherlands to the United States in

12  order to commit perjury.  If Irma and her mother simply wanted

13  to spirit the children away --

14         THE COURT:  I need to interrupt on just that point

15  because I -- something that's not in evidence but I think I can

16  fairly ask it, and I should have asked it before you began.

17         How did it come about that Nadija was a witness here?

18  That is to say, did the government reach out to her?  Did her

19  daughter reach out to her?  Who was the immediate agent, so to

20  speak?

21         MR. BEATY:  On the first meeting that the government

22  had with Irma, she stated her mother would be returning to the

23  U.S. in early January.  At that point the government asked Irma

24  to reach out to her mother to let her know that we'd like to

25  speak with her when she was here.

1              THE COURT:  Okay.  Very good.  Sorry to interrupt.

2              MR. BEATY:  Not at all, your Honor.

3         If Irma and her mother simply wanted to take the

4    children away to the Netherlands Irma could simply have left.

5    Her mother doesn't have to come back to the U.S. for her to do

6    that.  Her mother doesn't have to testify here for her to do

7    that.  Irma has had passports for the kids for almost two

8    months.  She could just go.  Michael Materasso is in jail for

9    drug use.  It doesn't matter whether this specification is

10   proved up.  He'll still be in jail.  Ms. Nezirovic did not need

11   to come to testify to keep him in jail, to the extent that

12   that's even necessary for this sort of fantastical conspiracy

13   to work.  Irma hasn't left and her mother did come here.  She

14   took the stand.  And she told you what she saw.

15        The defense also suggests that perhaps Ms. Nezirovic

16   is testifying vindictively because her son-in-law cheated on

17   her daughter.  This, too, isn't supported by the evidence.  She

18   testified that she's not angry at Michael Materasso.  She's

19   simply worried about her daughter.  And the defendant testified

20   that he's cheated on Irma a number of times.  And why now?

21   This isn't the first time that she -- that Ms. Nezirovic has

22   heard about Michael's infidelity.  This isn't the first time

23   she observed Michael's abusive behavior.

24        Irma has largely been a single mother of two girls

25   while the defendant has been in prison.  So why all of a

1    sudden, at this point in 2014 has Ms. Nezirovic decided to

2    become a criminal and perjure herself?  It doesn't make any

3    sense.

4         Again, it doesn't make sense that Ms. Nezirovic would

5    invent this particular story.  It's not violent.  It doesn't

6    involve threats.  It doesn't involve any abuse of the

7    daughters.  She could have come up with anything in the world.

8    But instead she admitted a number of times that she had never

9    seen the defendant hit Irma.  She simply says she saw this

10   strange but shocking and embarrassing tying-up-naked incident.

11        If Ms. Nezirovic is making up the whole story and

12   rehearsed it with Irma in advance, why not embellish a little?

13   And why not fix the holes?  She could have testified that Jack

14   was barking.  Or correctly described where the dining room

15   table is located.

16        Ultimately, your Honor, this case comes down to

17   credibility of witnesses.  I submit to you that Nadija

18   Nezirovic's testimony was more credible than the defendant's.

19   You know that the defendant lied to you about drugs.  There is

20   no reason to think that he isn't also lying about November 5.

21        The defense has not delivered on any evidence that

22   Ms. Nezirovic is conspiring with Irma to kidnap the children by

23   lying on the stand.

24        In sum, the evidence has demonstrated by a

25   preponderance of the evidence that the defendant unlawfully

1  restrained Irma Materasso on November 5, 2014.

2          THE COURT:  Thank you very much.

3          I'll hear now from defense counsel.

4          MS. GLAVIN:  Your Honor, Mr. Materasso's parents,

5  Donna and Michael, Sr. are outside and they asked me if they

6  could be present for the summation.

7          THE COURT:  Sure.

8          MS. GLAVIN:  Your Honor, I just want to start with the

9  premise that even if you were to credit Nadija's testimony, it

10  doesn't meet the preponderance of the evidence standard for

11  unlawful imprisonment under New York law.  Just starting with

12  that premise.  Because her testimony alone, there is no

13  evidence that the tying up that she says happened or

14  restraining was unlawful or without anybody's consent.  So it's

15  not -- even at the end of the government's case, which is why

16  we move for directed verdict, we don't think it meets every

17  element by a preponderance of the evidence.

18          But even if your Honor says okay, if I just heard from

19  Nadija, that's enough.  I want to hit the arguments that I

20  think -- that I know you know are coming.

21          This case started, as you know, much broader.  When

22  your Honor signed the warrant for Mr. Materasso's arrest there

23  were four specifications.  Signed it on November 12.

24  Mr. Materasso turned himself in to state custody.  He was in

25  state custody for a little more than a month.

F1N9MATH                    Summation - Ms. Glavin

1          December 16 was the first day he appeared in this

2     courthouse.  The D.A.'s Office let him out so that he could

3     come and face your Honor.

4          Mr. Materasso appeared before a magistrate judge.  The

5     magistrate judge, if your Honor recalls, granted him bail.  We

6     had a telephone conference that evening on the 16th.  Your

7     Honor granted the government's stay until we could meet before

8     the Court on the 18th.  The 18th was the first time

9     Mr. Materasso has seen you again since the last time.

10         When we were here on the 18th I think there were two

11    important things that happened.  First and foremost, he pled

12    guilty immediately to specification No. 4.  No hesitation.  No

13    ask for a continuance.  I am guilty.  He didn't plead to 1 to

14    3.  And there was a reason for that and that's because he

15    didn't do it.

16         So he pleads guilty immediately, right off the bat.

17    The second thing that happens that day, which is pretty

18    important, is if we had any doubt about it, we learned that

19    Irma Materasso is not a shrinking violet.  Because your Honor

20    had a letter that he had to put on the record that day,

21    December 4 letter that Irma Materasso sent to Probation Officer

22    Olivares, which was then forwarded to the Court and put as part

23    of the record.  And in that letter Mrs. Materasso told the

24    Court, told all of us, that:  I left Michael on November 5,

25    went to a DV is shelter with my daughters.  The night before he

1    tied me up naked to a chair and did a cavity search on me

2    because he believed I was hiding his bag of drugs.  He was up

3    for five days.  He got extremely paranoid and still went to

4    work like that.  He's lucky he didn't kill some innocent labor

5    worker while operating a heavy machine, while being up for five

6    days on crystal meth.

7            Irma Materasso was pretty angry.  And Irma Materasso

8    didn't want Michael out of the state system.  And then when we

9    got to this courtroom she didn't want him out of here.  She got

10   her whole family involved.  She was getting her family involved

11   before then.  So, what happens next as this case proceeds along

12   the docket?

13           As your Honor knows, the defense began issuing a lot

14   of subpoenas.  The government hadn't spoken to Nadija Nezirovic

15   until within the last couple weeks is the first time.  They had

16   spoken with Irma.  And Irma had already locked herself into a

17   story because her story is in a written police report in a

18   statement that she signed.  Her story formed the basis --

19           MR. BEATY:  Objection, your Honor.  None of this is in

20   evidence.

21           THE COURT:  Well to the extent what is implicitly

22   being asked is that the Court take judicial notice of other

23   proceedings, that part is unexceptionable.

24           The question of whether I can take judicial notice of

25   what of a statement that was made by Irma in another court

1    seems to me a much closer question.  I will allow it for now

2    but -- but I would also point out the obvious.  Both sides

3    chose not to call Irma.  At an absolute minimum that suggests

4    that neither side felt that her evidence or her admissions or

5    whatever either side might have gained from her taking the

6    stand outweigh the negatives of calling her, the strategic

7    negatives.

8           So, if the government had felt that the benefits of

9    her firsthand knowledge outweighed the baggage that she

10   obviously brings, they could, if they chose, have called her.

11   They could have all sorts of strategic motives for not calling

12   her, the most obvious being that they had a witness who they

13   thought was credible and didn't have any of this baggage who

14   they decided to call.

15          The defense had similar dilemmas, if you will.  They

16   could have called her and spent, I'm sure, hours bringing out

17   all the baggage as well as the possible inconsistencies of the

18   sort of thing that counsel is now alluding to.  But they felt

19   that that was outweighed by whatever benefits the government

20   would obtain from having the defense call her to the stand, or

21   whatever.  I don't -- it's not for me to speculate.

22          MS. GLAVIN:  There's another possibility too.

23          THE COURT:  But the point is this.  Putting aside the

24   technical question of whether I can take judicial notice of

25   what you're now getting into, I don't think either side -- and

F1N9MATH                    Summation - Ms. Glavin

 1    this goes to both sides -- can have their penny and their cake.

 2    If you didn't call her, then what does it matter whether she

 3    gave inconsistent testimony in another court or not?

 4              MS. GLAVIN:  It's that, your Honor, she didn't mention

 5    anything -- if this scene happened as Nadija described it on

 6    the morning of the 5th.

 7              THE COURT:  If you're saying I should take notice of

 8    what she said so that I can -- because it contradicts what her

 9    mother said, that would be totally impermissible since you

10    didn't call her.

11              MS. GLAVIN:  Right.

12              THE COURT:  So I'm still missing now what you're

13    getting at.

14              MS. GLAVIN:  What I'm getting at is negative.  If

15    Nadija Nezirovic had actually witnessed this happening, Irma

16    Materasso has a big mouth.  She didn't have any problem writing

17    you, going off, calling him a psychopath.  Irma Materasso

18    through this incident doesn't talk to her mother.  Her mother

19    says that she comes out of that bedroom and she -- she did

20    change her story overnight.  As your Honor specifically asked

21    her on day one of her testimony:  When you came out were you

22    looking straight ahead and see this or did you have to turn and

23    look to your right?  And she told you unequivocally straight

24    ahead.  That was the last question for the day.

25              THE COURT:  I understand the arguments about that but

1   I don't see what that has to do with the immediate question,

2   which is what Irma said in a statement entered in state court

3   that was not part of the evidence in this case that you now

4   want me to in effect take judicial notice of.

5         MS. GLAVIN:  Simply the fact that Irma Materasso, her

6   not being a shrinking violet, shows that what Nadija Nezirovic

7   is describing happened on the morning of the 5th, she looks

8   to her daughter and says, you know, what's going on, or what's

9   the matter, and her daughter doesn't say anything?  Her

10  daughter is not yelling?  She's being tied up naked against her

11  will and being restrained?

12        THE COURT:  So the argument -- now I understand the

13  argument.  The argument is not what she said in that statement

14  but the fact that she's happy to describe this incident to the

15  world, specifically to the probation officer, to the state, but

16  at the time of the incident she doesn't tell her mother about

17  it.  I think that is an argument that can be made regardless

18  of -- I don't think that requires me to take judicial notice of

19  what was in the statement but just of the fact that she filed a

20  charge.  So I will, to that limited extent, permit the

21  argument.

22        MS. GLAVIN:  That's an important point here, your

23  Honor.  Because, number one, Irma Materasso, when we started

24  this, you saw the motion practice.  It was pretty spirited.

25  And the case became narrower, narrower, and narrower, to where

1    the government had no case because they only -- if they didn't

2    call Nadija.  And when did they become aware and start figuring

3    this out about Nadija, I don't know.  But for the very first

4    time after we briefed -- did briefing before your Honor, it was

5    January 14, two days later, after we submitted exhibits,

6    extensive exhibits, that the government says we've decided it's

7    in the interests of the family not to call her.  In the

8    interests of the family, that's why we're not calling her.

9    They suddenly came to that conclusion.  And it's in their

10   letter on the 14th.  I would urge you to read it carefully.

11   I think I read it about six times.  But no admission that we're

12   not calling her because of her baggage.  That says something.

13          So as we come into this hearing, your Honor, a couple

14   of I think sort of larger points.  Number one, we had no burden

15   to call anybody.  It's all the government's burden.  The

16   government ran away from Irma.  Not the defense.

17          And another option that your Honor could consider

18   about why the defense didn't call Irma is because the defense

19   is pretty comfortable that we didn't need to call Irma because

20   they didn't prove the case.

21          Now, in terms of the hearing.  There's three points I

22   want to make about Nadija's testimony.  The first is her --

23   it's the story about that morning of November 5.  Because her

24   story on day one was different than her story on day two, after

25   she got home, spends overnight with her daughter.

F1N9MATH                  Summation - Ms. Glavin

1          I think, your Honor, it is pretty clear that the

2    government had never gone through with Nadija in any detail the

3    specifics of what happened.  Who was standing where?  What part

4    of the apartment?  She was totally and utterly unprepared on

5    cross-examination for that.  And so she began flailing about on

6    day one as to where things were, which is why we had to lock

7    her down in Defendant's Exhibit 33A as to what she saw and

8    where people were standing when she opened the door to that

9    bedroom.  And she wrote down on 33A one thing.  Where the dog

10   was, where Michael was, where Irma was.  And her handwriting is

11   unmistakable that it was right there, right in front of her.

12   And then she went home.

13         Damn.  Now I know why Ms. Glavin was going through all

14   that.  This doesn't make sense.  She came back that night.

15   Goes to show how far that mother would go.  She took two photos

16   and she drew her own floor plan which I submit to you is not an

17   accurate floor plan but she drew a floor plan to make it

18   consistent with the testimony she knew she had already given

19   and was locked in.

20         Donna Materasso had never seen that floor plan before

21   and I don't think she knew who drafted it except there was some

22   foreign language on it.  This is Court Exhibit D.  She said no,

23   this is not -- this is too short.  This is not how this is

24   shaped.

25         She comes back next day.  She takes the photos.  And

F1N9MATH                    Summation - Ms. Glavin

1    the devil, your Honor, is in the details.  It's always in the

2    details when you're lying, which is why we went into incredible

3    detail.

4              She lied -- the whole event never happened.  This is a

5    woman who testifies that Michael was too embarrassed to come

6    back to the apartment.  Remember, there was this fight when

7    Nadija got there.  And Michael wasn't at the apartment.  And

8    Irma's:  Go away Michael, go away Michael.  And puts all this

9    stuff up against the door so he can't get in.  And then Irma

10   says to her mother Michael's embarrassed about coming back.

11             He's embarrassed about coming back but he's not

12   embarrassed about tying her up naked in the morning next to his

13   mother-in-law's room?

14             This is a guy who is embarrassed enough such that he's

15   changing his clothes in the bathroom when his mother-in-law is

16   there in the morning, early on before he goes to work, whereas

17   normally he goes out into the living room, has his work clothes

18   there and he changes right there.  This guy wasn't going to do

19   that in front of Nadija, the woman whom he had paid for the

20   plane ticket for her to come there.  No way.

21             So what we then see, the devil in the details.

22   Remember on day one of her testimony Nadija said, I kept asking

23   her, pushing her:  Well what did the table look like?  It had a

24   tablecloth on it.

25             There was no tablecloth on that table the last time

F1N9MATH                    Summation - Ms. Glavin

Michael Materasso was in that apartment, which was in November

of 2014.  He hasn't been back to that apartment since at least

November 12, 2014 and there was no tablecloth on that table.

          But she told you on day one there was a tablecloth

that day.  Well, yeah, because she's living in that apartment

right now and she took the picture last night and there was a

new tablecloth.

          The other thing that she didn't remember, she came

back on day two, was she can't see directly to the right.  The

dining room -- where the set-up is for the dining chair, you

walk out of that bedroom.  There is a hutch right there.  It's

in the photographs that she took.  You can't look from that

bedroom to where the dining area is and where the dining room

table is.

          Then let's talk about the tying up and the specific

chair.  That's one of the dining chairs.  I'm guessing it's

probably one of the chairs that's in Court Exhibit C.  But you

got -- I mean we all saw Irma Materasso, okay.  You can take

judicial notice.  You're just -- if you're going to tie her up

to a chair, okay.  You're going to tie her up like this?  Where

you could just stand up?  This makes no sense.  You're going to

tie her like this to do a body cavity search?  No.  I mean

it's -- Michael Materasso does a lot of things.  He didn't do

that.  And if he did that he would have done that a lot better.

          The second issue, and the story just didn't make

1    sense, and I've got to say you know for Nadija Nezirovic, she

2    would do anything for her daughter.  You could see that.  In

3    those e-mails from the 17th, and the back and the forth.

4    There's a desperation there.  She's also not being honest with

5    Donna Materasso.  The part about Donna -- Irma sold everything

6    she had, including her TVs.  The TVs are in the photo.  I mean

7    come on.  Come on, Nadija.  She lied for her daughter.

8            And your Honor, you know, when Mr. Beaty said she'd

9    come in here and commit perjury.  She doesn't even know what

10   this is.  She thinks we're in some Child Protective Services

11   proceeding.  Her daughter, with all the things her daughter has

12   done, her daughter has never spent a day in jail.  She doesn't

13   think you can do anything, quite honestly.  And I think that's

14   a fair inference.  I think she thinks that her testimony here,

15   nothing bad can happen to her.  She goes on her merry way.

16   She's been through a lot worse.  She was through the Bosnian

17   War.  But in her mind, this wasn't that big a deal.  Taking the

18   oath here in the child protective -- she doesn't even know what

19   these guys do.

20           Added to this is -- I mean thank God the defense

21   subpoenaed Irma for all of her communications with her mother,

22   which were produced by Mr. Cecutti on Monday.  If we hadn't

23   done that -- and it was a last minute call, but if we hadn't

24   done that she wouldn't have been exposed for the precise lie

25   that there is.  Both she and her daughter.  And it was an easy

1     one.

2            Why couldn't she just say it and it wouldn't have

3     mattered?  If she had just said, yeah, she drafted it for me.

4     Nadija read it to me.  I was fine with it.  I sent it a long.

5     It wouldn't have been a big deal.

6            But they knew there was a problem with that.  It's so

7     clear that she and her daughter were talking about that from

8     yesterday to today about what's going on.

9            We haven't talked about it, it's not part of the

10    record, but I would submit that the e-mail that was sent to us

11    this morning from Mr. Cecutti sort of proves the whole point.

12    They just -- Michael Materasso has got to live with the choices

13    he made and the family that he married into.  And he accepts

14    responsibility for those choices.  Because I've been scratching

15    my head as to how he got himself into all of this thing, and

16    who his wife is, and who his mother-in-law is.  But I think

17    what you heard here today is -- the last few days.  There was a

18    lot -- there was an incredible amount of truth.  There was an

19    incredible amount of truth, and there was extreme unhappiness.

20    Irma is a drug user.  So is Michael.  Michael was using while

21    he was out.  He admitted that.  And for the government to say

22    he admitted what he couldn't deny, denied what he couldn't

23    admit.  I love that phrase.  I used to use it all the time when

24    I sat over there.  The problem is he admitted things he could

25    have denied.  That's how you knew he was telling the truth.

F1N9MATH                    Summation - Ms. Glavin

1   You would never have known in September he had used crystal

2   meth.  He didn't have to tell you, as embarrassing as it was,

3   that he went to all these spas and was getting sexual acts

4   performed on him.  Many times.  And that's a crime.  And it's a

5   crime to commit adultery in New York.  That also subjects him

6   to a violation.  He was happy to explain exactly what happened

7   with the chair that he kicked.  And it's really interesting,

8   because the way Irma told everyone, they all believe he threw

9   it.  No.  He kicked it.

10          He had no problem telling the Court that he knows 50

11  ways to Sunday what works and what doesn't work to get -- to

12  pass a drug test.  And he went through it.  He's already talked

13  to Olivares about the sweat patch.  Yeah, I used it, this is

14  how I did it.  And there was one thing you can really believe

15  about Michael Materasso, he was telling you the truth when he

16  told you, no, it doesn't work.  Stays in your body for five to

17  eight days.  I've tried everything.  He has.  He knows he has.

18  If there's something he's an expert on, it's drugs, drug

19  testing, how to beat it.  And when he tells you or he tells me:

20  No, it doesn't work, you can't dilute it.  Doesn't work.

21  You're going to get caught.  I've already tried that.  I've

22  been there, done that.

23          The fact that Nadija Nezirovic walks out.  She's there

24  for two or three weeks.  The morning she's leaving, the morning

25  she's leaving is the morning Michael picks to tie his wife up

F1N9MATH                    Summation - Ms. Glavin

1    naked in the living room?  She's there on the 4th.  Michael

2    freely admitted there was an argument on the 4th.  He gave you

3    the specifics as to who slept where on the bed.  He went to

4    work on the 4th.  He took a drug test on the 4th.  On the

5    5th he got up.  5:15ish.  Sometimes hits snooze.  Then 5:30.

6    Puts the body pillow next to Gia so she doesn't roll off the

7    bed.  As he remembered it, when he went to bed on the 4th

8    Irma was still mad at him because he had been cheating on her,

9    even though he was denying it that night.  As he remembered it,

10   she was sleeping outside the bedroom.  When he woke up in the

11   morning, she was there.  He didn't even know she had come into

12   the bed.  He got up to do his job that it's a miracle he even

13   has a job given what's been going on for the last six years.

14          He gets up to go to work.  Yeah, that morning he's

15   embarrassed because he knows Nadija knows.  And what's going on

16   in the background, in terms of her motive to lie -- her motive

17   to lie isn't just because she hates Michael.  She's not a fan

18   of his.  And quite frankly if I were Nadija I wouldn't be a fan

19   of yours either.  But anyway, it's bigger than that.  Irma has

20   so much going on at that point and in those three weeks when

21   the mother-in-law is there.  Irma -- the stress of what's going

22   on where she disappears for a few hours one day, where the

23   government knows and it's part of a judicial record here in the

24   Southern District of New York where she was on October 23.

25   There's a lot on her mind and she's desperate.

1          And to find out now that her husband has been cheating

2     on her repeatedly.  If he leaves her -- she's not a U.S.

3     citizen.  What could happen with the FBI?  What could happen

4     with Child Services?  There's an open investigation.

5          Everything is very, very complicated.  And it's not

6     easy.  But if Michael is going out and getting it some place

7     else as opposed to being at home in a happy marriage, and it

8     might be that this time Michael leaves, because when is he's

9     home there, she's doing drugs and, as he put it, he did it too.

10    And it's a cycle.  He's going to end up right back here.

11         She got furious.  She couldn't take it anymore.  She's

12    told everybody under the sun a hundred different stories about

13    Michael.  Her mother believes all of it.  And it ends up in

14    e-mails that she blindly sends.

15         There is no other reason -- I mean it was like -- I

16    got to tell you, you did a much better job on cross than I did

17    because it was painful, and I realized your method was more

18    effective than mine, to do it calmer, because it was painful to

19    watch her try to explain why it is her daughter sent her that

20    e-mail.  And she was not going to go down, Judge.  She was

21    going to lie to the death.  And she didn't think that there was

22    a consequence in this courtroom, because we're just Child

23    Protective Services here, and we can't do anything.  We can't

24    even take kids away.  Which I want to add to that, this woman

25    is a social worker for 20 years and she doesn't think Child

1    Protective Services can take kids away?  And just the fact that

2    Irma is hysterical throughout the month of December, and is

3    repeatedly and obsessively e-mailing Donna Materasso about all

4    of her fears.  And somehow Nadija isn't told?  Oh I'm afraid

5    Child Protective Services may take the kids away.

6            So, you walk out.  You see your daughter tied up naked

7    by your son-in-law.  You don't say anything.  She doesn't say

8    anything.  You go back into your room.  You sleep for half an

9    hour.  Then a little while later you get up.  You make some

10   coffee.  Then you wait for your daughter to come out.  I think

11   she said it was about an hour-and-a-half before she spoke to

12   her daughter, the shrinking violet.  And then take Jack the Pit

13   Bull, who has been very quiet and dutiful throughout this whole

14   horrible incident, to the groomer so he's ready to go to

15   Holland.  It's not there.

16           I want to talk a little bit about Michael's testimony

17   and I want to talk a little bit about what I know Michael was

18   like from this Court.

19           As you can probably guess from all the activity in the

20   motion papers, and then the back and forth of whose been in and

21   out of this courtroom the last month.  This has been a pretty

22   horrible month for everybody involved.  Both families.  Michael

23   taking the stand was actually never a doubt.  And he knew that

24   he was going to be in a lot more trouble if he just didn't give

25   up and give you the whole truth.  He also knew that admitting

1     drug use could get him into more trouble with you.  Very

2     embarrassed.  Didn't want to admit about the massage parts.

3     And your Honor pushed him on it.  Well, what else did you get?

4     Well, I got other stuff.  And then he told you.

5              It's important to him that nobody ever think for five

6     seconds that he laid a hand on his wife in anger.  Because he

7     never did.  And he will admit what he did.  And he, believe me,

8     he has admitted things that he didn't have to.  And he did it

9     because it's the truth.

10             I think if you just compare how he answered questions

11    and even how his mom answered questions, compare that to the

12    way Nadija and Irma answered questions.  Because I would submit

13    to you that Irma and Nadija answered questions the way criminal

14    defendants or cooperators answer questions.  Michael and Donna

15    answered questions that you asked them.  Weren't going off and

16    giving you speeches.  You asked me a yes or no.  You got a yes

17    or no.

18             What Michael said on the stand does expose him -- it

19    actually exposes him to criminal liability.  But I just think

20    it speaks volumes.  He has asked me.  He would like your

21    verdict today and he'd like to be sentenced today.  I told him

22    it's unlikely, but I would mention it.

23             This has been -- he's been for two months,

24    two-and-a-half months.  He didn't do this.  He'll tell you all

25    the things he did do.  But he's not going to get up here and

F1N9MATH                    Summation - Ms. Glavin

1   lie to you and say something that he didn't do.  We don't think

2   the government met it by a preponderance.  The sheer number of

3   exhibits the defense had to put in, I think we put in more

4   evidence than the government.  We don't think they've met it

5   and we're asking you to find him not guilty on specifications

6   one to three.

7            THE COURT:  Before we hear from the government on

8   rebuttal, just with reference to the last point.  I'm not going

9   to render a verdict today because I think I need to carefully

10  review the evidence and including the arguments of counsel.

11  But Mr. Materasso, is quite right, given that he is in limbo

12  awaiting a sentence on the earlier -- the other specification

13  that he's admitted to, he's entitled to a prompt sentence.  So

14  I will give you my verdict no later than a week from today.

15  And we will then set a prompt sentencing date after you've

16  received the verdict through a telephone conference call to set

17  that date.  So it may be that I will give you a bottomline to

18  be followed by a fuller opinion.  But for sure you will at

19  least get the bottomline by a week from today.

20           Let me hear from the government on rebuttal.

21           MR. BEATY:  Your Honor, a lot of what Ms. Glavin said

22  focused on what Irma had said and done.  That's not in

23  evidence.  The letter that she sent to the Court is not in

24  evidence.  Irma wasn't here.  Prior inconsistent statements

25  that she may or may not have made are not relevant.  The only

1    evidence that matters is whether Ms. Nezirovic is lying.  And

2    the only evidence that the defense has put forward to suggest

3    that she is lying is this e-mail and this layout, the floor

4    plan issue at the apartment.

5         With the e-mail there is no evidence that that's a lie

6    at all.  Her story was consistent.  She said the first day that

7    her son had helped her write it.  That was corroborated by

8    Irma's testimony.  It was corroborated by the e-mail that

9    Mr. Cecutti sent that Ms. Glavin referred to.

10        Her explanation has been consistent and importantly

11   there is no reason for her to lie about that e-mail.  The

12   e-mail itself is unimportant.  There are no accusations in it.

13   It's just a plea to Donna Materasso to help her daughter out

14   financially.  No reason for her to lie.

15        With respect to the layout, she explained from the

16   beginning, she said she wasn't very good with maps.  She

17   expressed confusion about what represented the door on the

18   layout or on the floor plan.  And, again, it's not -- there is

19   no serious dispute that she's been at the apartment and that

20   she knows where the dining room table, in fact, is.

21        With respect to this story that the defense thinks

22   that Ms. Nezirovic made up.  If she made this up, she could

23   have done a lot better.  She knows that Irma's not a shrinking

24   violet.  So she could have made up a story about how Irma

25   reacted, about how she was screaming, about how she had to

1    comfort her all day.  If Irma and Ms. Nezirovic were in the

2    apartment alone together later that morning, she could have

3    said anything.  But what she told you was she had coffee.  They

4    took the dog to the groomer.  Those things suggest that she's

5    telling the truth, not that she made it up.

6            Finally, the defendant's testimony.  He has denied and

7    denied everything until he had literally no choice but to admit

8    it.  He admitted that he went to these massage parlors because

9    that went to the defense theory that Irma was upset about

10   adultery.  But he -- when he was asked about threats, he said

11   that the only time that he had ever threatened Irma, that is

12   threatened to kill Irma and make it look like an accident was

13   one time in a series of text messages that he knew the

14   government had because it had been put into evidence against

15   him before.  Other than that, had never threatened Irma.

16           On the stand he did lie about his drug use.  About his

17   cocaine use again, and again until he was confronted with

18   proof.

19           Finally, the defense has raised the issue about

20   consent, suggested that even if Ms. Nezirovic's testimony is

21   true, maybe Irma had consented to being tied up.  There is no

22   evidence of that at all.  You know that the defendant has

23   threatened her in the past.  There is evidence that she was

24   afraid of him.  She was blockading him out of the apartment.

25   You know they had a fight, many arguments over the course of

F1N9MATH                    Summation - Mr. Beaty

1  Ms. Nezirovic's visit.  And they had a fight either the night

2  before or several days before.  And under those circumstances

3  it doesn't make sense that she would consent to be tied up

4  naked.

5          Importantly, she went to a domestic violence shelter

6  after this incident.  That's not the behavior of someone who

7  has consented to being tied up naked.

8          Your Honor, I submit that the government has proven

9  its case by a preponderance of the evidence.  Thank you.

10          THE COURT:  All right.  Well I thank both counsel for

11  excellent arguments and indeed for very excellent presentations

12  throughout this quite interesting hearing.

13          I'm going to ask counsel before you leave this

14  courtroom today to collect the originals of the exhibits, one

15  of each, including the court exhibits and give them to my law

16  clerk or my courtroom deputy so we will keep them while I'm

17  working on the decision and then give them back to respective

18  counsel.  We will give them back we'll ask the government to

19  hold the court exhibits as well.

20          In terms of the transcript I take it no one was

21  ordering daily copy or were you?

22          MR. BEATY:  We were.

23          THE COURT:  So then I should be able to get the

24  transcript.  It should be here somewhere.  I'll get it from the

25  court reporter.

1          All right.  Anything else we need to take up now?

2          MS. GLAVIN:  There's one housekeeping matter, your

3     Honor.

4          Over the course of two days we were discussing

5     Defendant's Exhibit 65.  The first day that we were discussing

6     Defendant's Exhibit 65 was a copy that my firm had done and

7     there was a line on it.

8          THE COURT:  You've explained that.

9          MS. GLAVIN:  Then the second day.

10          So I think -- the one without the line on it should be

11     65A just so the record is clear.

12          THE COURT:  That's fine.

13          No one chose to offer -- I was a little surprised, the

14     e-mail letter that we got from Mr. Cecutti last night.  But I'm

15     willing to -- if both sides want, I'm willing to include that

16     in the evidence.  If either side objects I won't include it in

17     the evidence.

18          MS. GLAVIN:  No, your Honor.  We would ask that it be

19     included as part of the record.

20          MR. BEATY:  We have no objection.

21          THE COURT:  So we'll mark that as Court Exhibit E and

22     why don't you mark one of the copies you have when you give --

23     I want you to give my law clerk a complete set so she has in

24     one place a complete set of all of the exhibits and work with

25     counsel for the defense to do that rather than our trying to

F1N9MATH                        Summation - Mr. Beaty

1    put together what we've got in bits and pieces.  Very good.

2    Thanks so much.

3                (Adjourned)

INDEX OF EXAMINATION

Examination of:                                    Page

 NADIJA NEZIROVIC

Cross By Ms. Glavin  . . . . . . . . . . . . 345

Redirect By Mr. Beaty  . . . . . . . . . . . 354