FA6QGRAs

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA
3
                v.                        06 CR 150 (JSR)
4                                         Sentence
     JUSTIN GRAUER
5
                    Defendant
6    ------------------------------x

7                                         New York, N.Y.
                                          October 6, 2015
8                                         4:20 p.m.

9
     Before:
10
                         HON. JED S. RAKOFF
11                                        District Judge

12
                         APPEARANCES
13
     PREET BHARARA
14        United States Attorney for the
          Southern District of New York
15   JANE KIM
          Assistant United States Attorney
16
     FOX ROTHSCHILD LLP
17        Attorney for Defendant Grauer
     ROBERT W. RAY
18

19

20

21

22

23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

FA6QGRAs

 1              (In open court; case called)

 2              THE DEPUTY CLERK:  Will the parties please identify

 3     themselves for the record.

 4              MS. KIM:  Good afternoon, your Honor.  Jane Kim for

 5     the government.

 6              THE COURT:  Good afternoon.

 7              MR. RAY:  Good afternoon, your Honor.  Robert W. Ray

 8     Fox Rothschild LLP on appointment of the Criminal Justice Act.

 9     I am present here with my client, Justin Grauer.

10              THE COURT:  Good afternoon.  We are here for possible

11     resentencing.  The parties are agreed that the new offense

12     level would be 29.  The Criminal History Category is IV.  The

13     new guideline range would, therefore, be 151 to 188 months,

14     which, of course, would, if a guideline sentence were given, be

15     a very substantial reduction.

16              The government has opposed resentencing or reduction

17     because of Mr. Grauer's disciplinary history in prison, which

18     is somewhat extensive.  And that is why I wanted Mr. Grauer

19     here to hear his own side of that story.  I will not consider,

20     however, in any way, shape or form the incident of

21     February 2014 which was expunged; and although there is some

22     authority that says I could consider it, I don't think it is

23     really under the circumstances appropriate or fair to consider

24     it, so I won't.

25              Almost all the other incidents are basically fist

FA6QGRAs

```
 1    fights.  And it seems clear that Mr. Grauer has a penchant
 2    forgetting into fist fights.  He has kept his nose clean, so to
 3    speak, for the last few years in that regard, but it's not just
 4    one incident or two.  It's several incidents.  So I have some
 5    concerns about that.  Of course, there are a lot of other
 6    factors that both sides have mentioned:  The fact that the
 7    Court's original sentence was a considerable reduction from
 8    what the sentence might have been and so forth, but I will
 9    really focus today on whether Mr. Grauer's behavior in prison
10    is sufficiently egregious as to preclude any significant
11    reduction.
12          Let me hear first from defense counsel, then
13    government counsel, then from Mr. Grauer if he wishes to be
14    heard.
15          MR. RAY:  Yes, your Honor.  If I could just provide
16    context about what I hope to be the exercise of the Court's
17    discretion within that new range.  I will say this:  First,
18    there is one other prior disciplinary issue that I did want to
19    address before I get to the issue of fights and assaults.  It
20    is referenced by the government in its September 22 letter on
21    the second page at the top.  It is also contained within
22    Exhibit D to that letter.  This is the issue about possession
23    of a narcotic or related paraphernalia not prescribed for the
24    defendant by medical staff.
25          I think a review of the records will indicate, and my
```

FA6QGRAs

1    client's own statements are consistent with that, and that is,

2    that he was prescribed medication at a particular point in time

3    which included these antianxiety and antidepressant

4    medications.  They were for the purpose of being consumed at

5    the time they were prescribed.  He retained them, so he's

6    guilty of a disciplinary infraction by hanging on to medication

7    that should have been consumed.  He kept it in an Aleve bottle.

8    But I did not want the Court to be left with the notion that

9    what this was about was his attempt to smuggle in narcotics

10   into the institution.  They were prescribed to him.

11        THE COURT:  Yes, the government may know more about

12   this, but at least from the little I know, these two substances

13   are not narcotics in the normal sense.  These are essentially

14   medications.  Now some medications can have a narcotic effect,

15   but this is not like heroin or cocaine or something of that

16   nature.

17        MR. RAY:  So not to make excuses, he does accept

18   responsibility for the fact that what he did was unauthorized,

19   but I didn't want the record to be left to wonder or your Honor

20   to wonder whether or not this was truly a smuggling operation

21   of some kind or if it was an effort to bring narcotics from

22   outside of the institution into the institution.  He was

23   originally prescribed this medication, and in that sense what

24   he did was hang on to it, which he shouldn't have done.

25        THE COURT:  All right.

FA6QGRAs

1          MR. RAY:  Now, with regard, I think, to the principal

2     issue that I think your Honor would like us to address, and

3     that is the question of the fights and assaults in prison, I

4     want to be careful here, but I do think there is some context

5     that is useful; not to excuse a disciplinary report, which I

6     think I would characterize as far from model.  Understand, your

7     Honor, this is somewhat of an unusual case.  Where we're

8     talking about Mr. Grauer who has served come February ten years

9     of a 235 month sentence, so we're talking about a long period

10    of time in a maximum security institution.

11         THE COURT:  Yes, that is all true, but remember that

12    in his original sentencing, even though the guideline range

13    stipulated in his plea agreement was 188 to 235 months,

14    probation had recommended no less than 360 months based on his

15    very extensive criminal history, which is what put him up in

16    Category VI.  So, looked at from that angle, there was a

17    neutral party, the probation office, recommending that he do 30

18    years.

19         MR. RAY:  True.  But I will say with regard to that --

20    and I wasn't there; your Honor did the sentencing -- I believe

21    that what drove your Honor's query at sentencing as to why the

22    government took a plea under the terms it did related to what

23    amounted to essentially charge bargaining over quantity.  I

24    think that is what actually pushed it into a land that would

25    otherwise, according to the probation office, have resulted in

1     an otherwise higher sentence.

2            I'm not here to argue about that.  I wasn't there.

3     Your Honor made the decision that you made.  There is no point

4     in revisiting that, but I did want the record to reflect at

5     least my understanding of why we landed in the range that we

6     landed in when Mr. Grauer was originally sentenced.

7            Also, with regard to his prior criminal record at the

8     time of the original sentencing, it does reflect a background

9     and a penchant, as your Honor said, even at that point in his

10    life with regard to assaults and fights.  But my review of that

11    record is that those were convictions under New York State law,

12    all of which were misdemeanors.

13           With regard to his record, not to minimize it, while

14    in the institution, I think your Honor has already noted that

15    within at least the approximately last three years he has

16    stayed out of trouble.  The fights and assaults without getting

17    into who started it -- and what I think my experience has shown

18    not just the record in this case but in many other cases -- in

19    maximum security institutions, there are measures that inmates

20    take in a preemptive way to otherwise to protect themselves.

21    It's not to excuse the conduct but it happens.

22           The second thing to say about it is that now I believe

23    this record correctly reflects with regard to his disciplinary

24    conduct the absence of any contraband in the institution, no

25    weapons of any kind; and while it does reflect assaults and

FA6QGRAs

 1    fights, no one in that context was seriously injured.  I don't

 2    mean to minimize it, but I just think that context is

 3    important.  Mr. Grauer can speak to the specifics.  I know your

 4    Honor, I'm sure, has questions, but I at least wanted that

 5    context to be presented here.

 6            THE COURT:  Very good.  Let me hear from the

 7    government.

 8            MS. KIM:  Yes, your Honor.  Two very brief points at

 9    the outset.  In terms of the July 15, 2010 incident, the

10    government agrees with defense counsel's recitation of the

11    facts.

12            In terms of the February 12, 2014 incident and the

13    government's September 22 submission, the government would just

14    like to clarify that we came into possession of these reports

15    after the last appearance, so we just wanted to make sure that

16    the Court and defense counsel had all of that --

17            THE COURT:  And it was very conscientious of you to

18    provide that to me.

19            MS. KIM:  Yes, thank you.

20            One other thing, the government just wanted to

21    recognize that we believe the defendant's family is also in the

22    courtroom.  So we appreciate that they are here, and the

23    government rests substantially on our submission, but we just

24    want to make one main point and that is reiterated in our

25    submission; that is, that from approximately 2004 to 2012 for

FA6QGRAs

nearly a decade, regardless of whether or not the defendant was

in prison or out of prison, the defendant committed

approximately one violent or assaultive act each year.  If the

defendant had had perhaps one or two violent or assaultive

incidents while in prison, we think that would have been a

different story.  But here the record reflects that he has 13

disciplinary incidents --

THE COURT:  Let me ask you this.  Were any of those --

certainly none in prison involved weapons.  Were any of the

ones before prison involving weapons?

MS. KIM:  I don't believe that they did involve

weapons, your Honor.

THE COURT:  So, I mean, in thinking about it -- and

this is not to excuse it, but getting into fist fights and

things of that sort seems to me of a different order.  When

you're using a weapon, you are either intending to or you, at

least, run the very high risk of doing permanent damage to the

other person.  Now, that can happen in a fistfight, but it's

much less likely.  So I think there is something to the

notion -- I'm not, if at all, though convinced by defense

counsel's argument that this is necessarily a way of protecting

himself.

I want to hear from Mr. Grauer, but it is more

consistent with when angry, he resorts to his fists.  We don't

condone that.  We don't excuse it.  But it's not the same thing

FA6QGRAs

```
 1    as picking up a gun or a knife or something like that.
 2              MS. KIM:  Yes, your Honor, it's not the same thing as
 3    picking up a firearm, but we would say that it still arises to
 4    violent conduct and that the repeated instances are what
 5    concerns the government.
 6              THE COURT:  OK.  Very good.
 7              Let me hear from Mr. Grauer.
 8              MR. RAY:  Your Honor, I was just remiss, if I might
 9    say to your Honor and so the record reflects, my client's
10    parents both of them are here, including the defendant's father
11    Mr. Grauer, Ken Grauer who submitted a letter to I believe the
12    probation office which I think your Honor has, and he suffers
13    from ALS, but nevertheless made the trip into court at my
14    request this afternoon.
15              THE COURT:  Well, you know, I'm very delighted that
16    these folks are here.  I always have, to be frank, mixed
17    reactions when a fine family like this is present.  On the one
18    hand is the fact that it shows so much positive about them in
19    that they still love and want to be of assistance in any way
20    possible to the defendant, and that is a lovely thing, and it
21    reflects that there is good in him too or they wouldn't have
22    those kinds of feelings.
23              On the other hand, they, of course, are among the
24    victims of his crime because by committing crimes that led to
25    his imprisonment, he took himself away from them in ways that
```

FA6QGRAs

1    clearly have caused them anguish.  So it is a mixed sword, but,

2    in any event, I'm very happy they're here.

3              MR. RAY:  The family members present include his

4    grandparents, his uncle, his aunt, so a number of people.

5    Obviously, they are most aware of how long this has been, how

6    long a sentence this is, and how much time he's already served

7    but I just wanted to be sure your Honor was aware.

8              THE COURT:  Mr. Grauer.

9              THE DEFENDANT:  Your Honor, I first want to say I

10   appreciate you allowing me the opportunity to come here and

11   speak for myself and present some issues directly as a man to

12   man.  And in light of the infractions I caught while in BOP, I

13   want to say I a hundred percent take full responsibility for

14   every infraction I caught.  And even though, you know,

15   hindsight is 20/20, and looking back I feel like honestly I

16   could have made better decisions and handled things in a much

17   more mature way, much better, more educated way, I guess.  But

18   every day of my life is like a process of evolution, so I say

19   this to say in the first part of my incarceration, I was still

20   immature, and I was still going through a lot of growth and

21   development.  And, unfortunately, I didn't grow as fast as I

22   should have grown, and I probably could have handled each

23   situation differently.

24             THE COURT:  Well, there must be situations now that

25   you face where other inmates are either giving you a hard time

FA6QGRAs

or threatening you or you have substantial disagreements with

them where in the past you would fight them, why are you not

doing that now?

          THE DEFENDANT:  Well, like I was saying, I've grown a

lot in the last couple years.  I've been through a lot of

experiences where, you know, experience is the best teacher, so

something I might have been more quick to fly off the handle

with a couple years ago, I'm more passive.  I look past it and

say, you know, it's not worth it.  I've learned through going

through trials and tribulations.  Not only that, but I'm trying

to do the right thing.  I'm taking things into consideration.

I'm in a maximum security prison where not everybody around me

wants to change.  You know what I mean?

          THE COURT:  I understand that it's not populated

entirely by Mother Teresas, yes.

          THE DEFENDANT:  So when you're an individual or a

certain part of a group of individuals that do want to change,

you're kind of looked at like you're ostracized because you're

not one of the bad guys or at least you're not trying to be one

of the bad guys any more.  So when you're trying to change and

the majority doesn't care about changing because they're never

going home or they're not going home for 20, 30 years, you're

kind of looked at as a Mr. Softy, so they try to take advantage

of you or they try to push your buttons and see if they could

get over on you because a lot of people prey on the weak, so

FA6QGRAs

```
 1    they see your lack of hostility as a weakness.  So sometimes
 2    I'm in certain situations where I have to stand up for myself
 3    and defend myself so I'm not victimized in the future.
 4              THE COURT:  How are you handling that now?
 5              THE DEFENDANT:  So far, so good.  The last three years
 6    I haven't had no physical disputes or anything.
 7              THE COURT:  I understand that, but there must have
 8    been -- I understand exactly the psychology you are talking
 9    about that some of the other inmates have, so you must still be
10    being placed in situations where they're baiting you, where
11    they're trying to get you to retaliate.  And when you don't,
12    what do they do then?
13              THE DEFENDANT:  Well, my tolerance is -- I have a
14    higher tolerance now.  I just walk away or I, you know, I don't
15    let words -- I used to let words bother me, words and, you
16    know, of course, physical -- physical contact bothered me.  I
17    used to let more words bother me, and I would feed into it.
18    Now I turn the other cheek, so to speak.  I let things role off
19    my shoulder more now because I believe I'm getting older.
20    That's what I personally believe; I'm in the process of
21    evolution.
22              THE COURT:  How old are you now?
23              THE DEFENDANT:  I'm 35.  When I started, I was 25, 24.
24              THE COURT:  Well, there's a lot of studies that
25    suggest that actually people do change psychologically in the
```

FA6QGRAs

1    way you indicate around the mid-thirties, so congratulations;

2    you met the test.

3              THE DEFENDANT:  Thank you.

4              THE COURT:  I was going to go through each of these

5    incidents, but I think giving further thought to it, that would

6    not necessarily be productive.  It was very important to me

7    though to hear from you personally, so I'm very happy you're

8    here.

9              Is there anything else anyone wanted to raise for the

10   Court at this time?

11             MS. KIM:  Not from the government, your Honor.

12             MR. RAY:  Your Honor, I would ask in conclusion that

13   you do exercise your discretion to sentence within the range.

14   I have made the point that if it would be logical to conclude

15   consistent with the way your Honor approached this from the

16   original sentencing, that giving the defendant the benefit as

17   he is eligible for -- understanding that it's discretionary

18   with the Court -- to that reduced range, would put him in the

19   new range, and that your Honor would sentence him to the top of

20   that range just as you did in the original sentencing.

21             THE COURT:  Mr. Grauer may not know this, but Mr. Ray

22   is in my view one of the finest attorneys that practice in this

23   court.  I said this publicly on many occasions.  One of the

24   reasons is he doesn't ask for something absurd.  He reads the

25   judge's mind and he knows what is possible.  And I thought,

FA6QGRAs

1   Mr. Ray, this was a very good example.  There is no way I would

2   have considered giving him like the bottom of the range, but

3   the top of the new range seems to me to be a reasonable

4   request.

5          MR. RAY:  Finally, I would just say, so your Honor

6   knows context, because it took me a while to do the math, and

7   even though it's somewhat difficult to figure out how much BOP

8   gives for good time served and how in this particular instance

9   given the disciplinary record -- which may be wiser for me not

10  to mention, but I need to mention it -- it's not clear how much

11  credit he'll get, but he will get some.

12          When I did the math, just so your Honor knows the

13  math, he served, come February, ten years.  If you figure if it

14  were at the bottom of the range of 151 and you cranked into the

15  equation what credit he would likely receive as a result of

16  having now served that amount of time, 151 would actually

17  probably put Mr. Grauer close to time served come the beginning

18  or so of next year.  What we're talking about, the remaining

19  amount of time even at the higher end, it probably what amounts

20  to a three year sentence or so remaining to be served.  I

21  wanted your Honor to understand kind of where we are now in

22  October of 2015.

23          THE COURT:  All right.

24          MR. RAY:  That's it.  Thank you.

25          THE COURT:  Thanks very much.

FA6QGRAs

1          THE DEFENDANT:  I appreciate that, your Honor.  Thank

2     you.

3          THE COURT:  Mr. Grauer is, of course, saddled with his

4     past.  The past cannot be erased.  The past is a very sad and

5     disturbing one.  Just from our discussions here and my

6     recollection of the case earlier, it's clear that Mr. Grauer is

7     an intelligent person who could have done a lot better for

8     himself.  But he is still a young man, and I think there is

9     every indication that he is moving in a direction that warrants

10    some consideration, so I am going to grant him the reduction to

11    the top of the new guideline range.

12         So, the sentence of the Court is that he is sentenced

13    to 188 months in prison to be followed by supervised release on

14    the same terms and conditions as previously set.  I can't

15    remember whether those conditions included anger management as

16    a special condition; but if not, we will add one now.  So he

17    will, upon his release, be given anger management help as the

18    probation office determines it is appropriate.

19         Before I advise the defendant of his right to appeal,

20    is there anything else either counsel wishes to raise with the

21    Court anything from the government

22         MS. KIM:  No, your Honor.

23         THE COURT:  Anything from the defense?

24         MR. RAY:  No, your Honor.

25         THE COURT:  Mr. Grauer, you have the right to appeal

FA6QGRAs

1    this sentence.  Do you understand that?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  If you can't afford counsel for any

4    appeal, the Court will appoint one for you free of charge.  Do

5    you understand that?

6              THE DEFENDANT:  Yes, your Honor.

7              THE COURT:  Good luck to you.

8              THE DEFENDANT:  Thank you.

9              MS. KIM:  Thank you, your Honor.

10             (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25